**ATLANTIC STATES LEGAL FOUNDATION, INC.,**
Plaintiff–Appellant,

v.

**TYSON FOODS, INC.,**
Defendant–Appellee.

No. 89–7232.

United States Court of Appeals, Eleventh Circuit.

April 5, 1990.

---

[*] *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

David H. Pope, Eric E. Huber, Carr, Tabb & Pope, Atlanta, Ga., and Clyde E.

Riley, Trimmer & Associates, P.C., Birmingham, Ala., for plaintiff-appellant.

Nancy K. Stoner, U.S. Dept. of Justice, Washington, D.C., amicus curiae.

H. Thomas Wells, Jr., Alfred F. Smith, Jr., Maynard, Cooper, Frierson & Gale, Birmingham, Ala., and Michael H. Mashburn, Mashburn & Taylor, Fayetteville, Ariz., for defendant-appellee.

Before KRAVITCH and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

This case arises out of violations by Tyson Foods, Inc. ("Tyson"), between May of 1986 and February of 1988, of the limitations on discharges of pollutants from its poultry processing plant in Blountsville, Alabama, as set out in its National Pollution Discharge Elimination System ("NPDES") permits. Plaintiff-appellant, the Atlantic States Legal Foundation, Inc. ("ASLF"), appeals from the district court's entry of summary judgment in favor of Tyson on the grounds that the court erred in dismissing the suit as moot and in refusing to award penalties. The district court held that the Supreme Court's decision in *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) required it to dismiss as moot a citizen suit seeking relief for violations which, although occurring before and after filing of suit, had ceased at the time of defendant's motion for summary judgment. Alternatively, the court held that its equitable powers allowed it to deny relief in the form of civil penalties where the defendants had made a good faith effort at compliance. Because we find that the district court erred in dismissing the suit and refusing to award penalties, we reverse and remand.

## I.

In May of 1986, Tyson acquired several poultry processing plants in Alabama when it bought Lane Processing, Inc. out of bankruptcy. Lane owned Spring Valley Foods ("Spring Valley"), which operated a processing plant in Blountsville, Alabama. Spring Valley discharged various pollutants into the Locust Fork of the Warrior River in Alabama by way of Posey Creek and Graves Creek. These discharges were regulated by section 402 of the Federal Water Pollution Control Act (hereinafter "the Clean Water Act"), 33 U.S.C. § 1342, which authorizes the administrator of the EPA ("Administrator") to issue NPDES permits allowing the discharge of pollutants into navigable waters in accordance with specified conditions. Under section 402(b) of the Act, a state may establish and administer its own permit program. If that program conforms to federal guidelines and is approved by the Administrator, the issuance of federal permits is suspended. In the instant case, Spring Valley's discharge of pollutants was regulated by a permit issued by the Alabama Department of Environmental Management ("ADEM") in accordance with the state's federally approved NPDES program.[1]

Section 308 of the Clean Water Act also requires plant operators to maintain and file Discharge Monitoring Reports ("DMRs") with appropriate authorities which reflect the terms of their NPDES permits and the amount of actual discharges. The DMRs for the Blountsville plant were filed with the ADEM.

The DMRs filed by Spring Valley prior to Tyson's acquisition of the plant demonstrate that Spring Valley had committed continuous and daily violations of its NPDES permit. John Reid, an employee of Tyson, stated in an affidavit that at the time Tyson acquired Spring Valley, the water treatment system was "both inadequate and in a poor state of repair."

---

1. The permit in effect through November 1987 regulated the following pollutants among others: BOD5 (Biochemical Oxygen Demand—5 day), TSS (Total Suspended Solids), FEC (fecal coliform), and O & G (oil and grease). As of December 1987, NH3N (Ammonia Nitrogen) and TKN (Total Kjeldahl Nitrogen) have also been regulated.

After acquiring Spring Valley, Tyson did not shut down the plant in order to upgrade its water treatment system, but continued the plant's operation. Indeed, one Tyson employee stated that Tyson increased its volume of production by adding a second shift of workers.[2] Tyson did, however, begin taking steps towards improving the system in order to bring it into compliance with the Clean Water Act. By January of 1987, eight months after acquisition, it had completed a "Final Design Summary of Waste Water Treatment Facilities."

■ In April of 1987, ASLF, a membership organization devoted to environmental and clean water issues, sent to Tyson and appropriate government agencies, a sixty-day notice letter as required by section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), stating its intention to commence a citizen suit under the Clean Water Act.[3] The purpose of giving notice to an alleged violator "is to give it an opportunity to bring itself into compliance with the Act and thus likewise render unnecessary a citizen suit." *Gwaltney*, 484 U.S. at 60, 108 S.Ct. at 382–83.[4] As Tyson's permit violations continued, ASLF filed a complaint against Tyson on August 7, 1987, seeking injunctive relief and civil penalties payable to the United States Treasury,[5] as well as attorney's fees and costs.

On September 2, 1987, Tyson responded with a motion to dismiss for lack of standing and a motion to stay discovery on the merits until the standing issue was resolved. Before ASLF responded to the motion, the district court granted Tyson's motion to stay discovery and excused Tyson from answering ASLF's complaint or responding to its discovery requests. Tyson was allowed to conduct discovery of ASLF and its members.

In December of 1987, the Supreme Court decided *Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), in which it interpreted the jurisdictional requirements of the Clean Water Act's citizen suit provisions. ASLF filed an amended complaint to conform to the *Gwaltney* requirements for invoking the jurisdiction of the court.[6] On March 4, 1988, the district court issued an order in which it found that ASLF had standing to maintain an action against Tyson. *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 682 F.Supp. 1186 (N.D.Ala.1988).

In the same order, the court, citing to *Gwaltney*, decided *sua sponte* to stay the proceedings "until such time as the effectiveness of the upgraded wastewater facili-

---

2. Michael Terry, the current wastewater treatment manager at Tyson, stated that the number of chickens processed per day approximately doubled after Tyson's acquisition of the plant. However, Mark Waller, former plant manager of the facility, stated that the increase in shifts did not increase total production as measured in weekly production of finished pounds.

3. ASLF informed Tyson that its lawsuit would allege that Tyson had violated and continued to violate the effluent standards or limitations under the Clean Water Act by not complying with its NPDES permit. In its notice letter, ASLF pointed to alleged violations of permit limitations on BOD5, TSS, FEC, and O & G.

4. The purpose of giving notice to federal and state authorities is to allow them to commence their own enforcement actions. If an enforcement action is commenced by either the State or the Administrator within the 60 day period, the citizen suit is barred. 33 U.S.C. § 1365(b)(1)(B).

5. Penalties paid as a result of a § 1365 citizen suit do not go to the plaintiff who instituted the

suit, but rather are paid into the United States Treasury. This is because citizen plaintiffs who bring actions under § 1365 are suing as private attorneys general seeking enforcement of a federal law. *See Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 53, 108 S.Ct. 376, 379, 98 L.Ed.2d 306 (1987); *Sierra Club, Inc. v. Electronic Controls Design, Inc.*, 703 F.Supp. 875 (D.Or.1989); *Public Interest Research Group of New Jersey, Inc. v. Struthers–Dunn, Inc.*, Civ.A. No. 87–1773 (D.N.J. Aug. 16, 1988) (1988 WL 147639).

6. *Gwaltney* held that in order to invoke jurisdiction under § 505 of the Clean Water Act, a plaintiff need only *allege* "a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." 484 U.S. at 57, 108 S.Ct. at 381. The district court found that ASLF's amended complaint was adequate to invoke jurisdiction under *Gwaltney*. 682 F.Supp. at 1190.

ty at Tyson's Blountsville plant can be evaluated." 682 F.Supp. at 1190. The court reasoned that "[w]hen the pollution has ceased, the action is moot and it is doubtful whether civil penalties may be recovered in such a case." *Id.* The court noted that the affidavit of Tyson's plant manager stated that Tyson already had spent $2.5 million upgrading the wastewater facility at the plant and opined that "when fully completed, the upgraded system should eliminate violations of Tyson's permit limits at that plant." *Id.* The court concluded that "it appears likely that [the complaint] will be rendered moot when that upgraded system is fully operational." *Id.* Tyson was excused from responding to ASLF's complaint until thirty days after the stay was lifted.

In May of 1988, Tyson filed a "Suggestion of Mootness" as to ASLF's complaint, stating that its wastewater treatment facility, which had been placed in initial operation on December 17, 1987, had become fully operational in mid-February of 1988 and that it had not exceeded its NPDES permit limitations for any pollutant since that time. On July 29, 1988, pursuant to ASLF's request, the district court lifted the stay of proceedings entered March 4, 1988 and the stay of discovery entered in September of 1987.[7]

In November of 1988, both sides filed motions for summary judgment. At the time the motions were filed, it was clear that Tyson had violated its permit limits for twenty-one months: from May of 1986, when it took over plant operations from Spring Valley, until mid-February of 1988, when its newly constructed wastewater treatment facility became fully operational.[8] The violations were self-reported in DMRs filed by Tyson as required by statute.

ASLF filed its complaint in August of 1987. Thus, the violations occurred for fifteen months preceding ASLF's filing of the complaint and for six months afterwards. According to ASLF, Tyson had 57 daily and 16 monthly pre-complaint violations and 34 daily and 8 monthly post-complaint violations.[9] Thus, at the time of the summary judgment motion, ASLF sought civil penalties for a total of 91 daily and 24 monthly violations.

The district court ruled on the cross motions for summary judgment in March of 1989, approximately 19 months after ASLF had filed its complaint. At that time, Tyson had been in compliance for a little over one year. The court granted summary judgment in favor of Tyson and denied ASLF's motion for summary judgment.

## II.

The question before us is whether the district court erred as a matter of law in holding that ASLF's claim for civil penalties became moot once Tyson came into compliance and injunctive relief was no longer appropriate. In addition, we must rule on the district court's alternative holding that even if the suit was not moot, the court, based on its equitable powers, would refuse to award penalties because of the efforts of the defendant to comply and the plaintiff's lack of due diligence in investigation. We address this alternative holding in Part III below.

The district court's holding that ASLF's suit was rendered moot by Tyson's compliance was based largely on its reading of the Supreme Court's holding in *Gwaltney.* It is important to note, however, that *Gwaltney* dealt primarily with the question of jurisdiction and not mootness. Indeed,

---

**7.** On July 7, 1988, the United States was granted leave to participate as amicus curiae and filed a brief in district court opposing dismissal. The United States has also filed an amicus curiae brief before this court.

**8.** ASLF does not appear to argue that Tyson should be held responsible for the permit violations of Spring Valley.

**9.** The NPDES permit issued to Tyson provides daily maximum and monthly average limitations on the maximum amount or concentration of the pollutants discharged by the plant. For discussion of the difference between daily and monthly violations, see Part V.A.2 below.

the *Gwaltney* court's discussion of the application of the mootness doctrine to citizen suits occurs in the context of its discussion of jurisdiction. Thus, there is no explicit discussion of the relationship between mootness and civil penalties. Although we are concerned here only with the question of mootness, a review of the holding of *Gwaltney* should help clarify its application to the instant case.

A. Jurisdiction

In *Gwaltney*, the Supreme Court faced the question of whether section 505 of the Clean Water Act "confers federal jurisdiction over citizen suits for wholly past violations." 484 U.S. at 52, 108 S.Ct. at 378. That section states that in the absence of federal or state enforcement, private citizens may commence civil actions against any person "alleged to be in violation of" the conditions of their NPDES permit.

*Gwaltney*, like the present case, involved a citizen suit filed in response to a company's repeated violations of its NPDES permit when discharging pollutants from its meat-packing plant into a river. Two environmental groups sent notice to Gwaltney in February of 1984 and filed a complaint against Gwaltney in June of 1984 seeking injunctive relief as well as civil penalties. Records indicated that Gwaltney's last recorded violation had occurred in May of 1984, one month before the complaint was filed.

The district court did not grant injunctive relief, but imposed civil penalties on Gwaltney. 611 F.Supp. 1542 (E.D.Va.1985). The court of appeals affirmed. 791 F.2d 304 (4th Cir.1986). In imposing penalties, the courts held that the citizen suit provision of the Clean Water Act authorized civil penalties for wholly past violations.[10]

The Supreme Court, after examining the language and structure of the statute and comparing citizen suits with enforcement actions brought by the Administrator, reversed the lower courts. It held that for purposes of federal court jurisdiction, citizen plaintiffs must "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." 484 U.S. at 57, 108 S.Ct. at 381. The Court noted that section 505 of the Clean Water Act authorizes citizens to seek both injunctive relief and the imposition of civil penalties under section 309 of the Act, 33 U.S.C. § 1319(d). It held, however, that "citizens, unlike the Administrator, may seek civil penalties only in a suit brought to enjoin or otherwise abate an ongoing violation." *Id.* at 59, 108 S.Ct. at 382.

The Supreme Court stressed that citizen-plaintiffs need not *prove* their allegations of ongoing noncompliance before jurisdiction attaches under section 505. Instead, a good faith allegation of violations that continued at the time suit was filed is sufficient for jurisdictional purposes. *Id.* at 64, 108 S.Ct. at 385. It thus remanded the case in order for the lower courts to determine whether the citizens groups' allegations of continuing violations were made in good faith.

B. Mootness

In *Gwaltney*, the discussion of mootness occurs in the context of the Supreme Court's reassurance that its construction of the threshold requirements for jurisdiction would not affect principles of mootness. We quote the passage in full:

> Petitioner [Gwaltney] also worries that our construction of § 505 would permit citizen-plaintiffs, if their allegations of ongoing noncompliance become false at some later point in the litigation because the defendant begins to comply with the Act, to continue nonetheless to press their suit to conclusion. According to the petitioner, such a result would contravene both the prospective purpose of the citizen suit provisions and the "case or controversy" requirement of Article III. Longstanding principles of moot-

---

**10.** Gwaltney argued unsuccessfully before the district court and court of appeals that the Fourth Circuit should adopt the analysis of the Fifth Circuit in *Hamker v. Diamond Shamrock* *Chemical Co.*, 756 F.2d 392, 395 (5th Cir.1985) which held that "a complaint brought under [§ 505] must allege a violation occurring at the time the complaint is filed."

ness, however, prevent the maintenance of suit when " 'there is no reasonable expectation that the wrong will be repeated.' " *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (quoting *United States v. Aluminum Co. of America,* 148 F.2d 416, 448 (CA2 1945)). In seeking to have a case dismissed as moot, however, the defendant's burden "is a heavy one." 345 U.S. at 633, 73 S.Ct. at 897. The defendant must demonstrate that it is *"absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Phosphate Export Assn., Inc.,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968) (emphasis added). Mootness doctrine thus protects defendants from the maintenance of suit under the Clean Air Act based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable "protestations of repentance and reform." *United States v. Oregon State Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978 (1952).

484 U.S. at 66, 108 S.Ct. at 386 (footnote omitted).

The meaning of this passage is ambiguous. Its apparent purpose is to assuage the petitioner's fears regarding the ramifications of the Court's holding that a mere allegation of ongoing violations will suffice to invoke a district court's jurisdiction over a section 505 suit. Thus, the Court may simply be saying that if jurisdiction is granted on the basis of the plaintiff's allegations of an ongoing violation, the suit may be dismissed as moot if it turns out later that there was no basis for jurisdiction—i.e., that violations were not in fact ongoing at the time of suit.

On the other hand, the wording of the passage suggests that the Court may be referring to post-complaint compliance. Even assuming that this is the case, however, the Court appears to be only addressing the mooting of injunctive relief.[11] Thus, the passage does not make clear whether the plaintiff's request for civil penalties is mooted as soon as the defendant's compliance moots the plaintiff's prayer for injunctive relief. It leaves open the question of whether, in a citizen suit, civil penalties may be assessed against the defendant when there clearly were ongoing violations and thus grounds for injunctive relief at the time suit was filed.

### III.

In the instant case, the district court's holding that the case was moot within the meaning of *Gwaltney* was based on two premises. First, in deciding whether there were ongoing violations, the district court focused on the presence or absence of violations at the time that it ruled on the parties' motions for summary judgment and not at the time the complaint was filed. Second, the district court held that once the injunctive portion of the case becomes moot, the civil penalties portion of the case must be dismissed as well. Given these two premises, the district court held that ASLF's complaint was moot because the pollution had ceased and there was no danger of future or intermittent pollution; therefore, neither injunctive relief nor civil penalties were available to the plaintiffs. Under the district court's reading of *Gwaltney,* the civil penalties provisions of a citizen suit becomes moot whenever a defendant begins to comply with the Clean Water Act.

■ We disagree with the district court's reading of *Gwaltney.* Specifically, we find that for purposes of assessing a plaintiff's allegations of ongoing violations, the court must always look to the date the complaint was filed. If on and after that date, the defendants continued to violate their NPDES permit, then the plaintiffs may request both injunctive relief and civil penalties.[12] This is consistent with the *Gwalt-*

---

**11.** All cases cited to by the Court involved prayers for injunctive relief under various antitrust laws. Thus, the discussion of mootness in these cases did not focus on damages.

**12.** Plaintiffs may also request injunctive relief

*ney* Court's holding that "citizens, unlike the Administrator, may seek civil penalties only in a suit brought to enjoin or otherwise abate an ongoing violation." 484 U.S. at 59, 108 S.Ct. at 382. If, after the complaint is filed, the defendant comes into compliance with the Act, then traditional principles of mootness will prevent maintenance of the suit for *injunctive relief* as long as there is no reasonable likelihood that the wrongful behavior will recur. However, the mooting of injunctive relief will not moot the request for civil penalties as long as such penalties were rightfully sought at the time the suit was filed.

██ At the time ASLF initially brought this suit, it requested an injunction and civil penalties based on good faith allegations of ongoing violations. Its complaint thus fulfilled the jurisdictional requirements of the Supreme Court's decision in *Gwaltney*. ASLF's claim for injunctive relief has since been mooted by Tyson's compliance, beginning in February of 1988, with the requirements of its permit. As this compliance is directly related to Tyson's new facility for wastewater treatment, and as this facility can be expected to operate in the future, we find that "the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Phosphate Export Assn.*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968).[13]

██ As we have stated, if the parties are able to make a valid request for injunctive relief at the time the complaint is filed, then they may continue to maintain a suit for civil penalties, even when injunctive relief is no longer appropriate. However, the showing necessary to maintain a suit for civil penalties must go beyond mere allegations. Plaintiffs must be able to *prove* that non-compliance was ongoing at the time they filed suit in order to be able to later maintain an action for civil penalties. The DMRs filed by Tyson for the months of May 1986 to February 1988 conclusively establish the existence of ongoing violations. Thus, ASLF has established liability under the Clean Water Act and is entitled to seek civil penalties for Tyson's non-compliance with its NPDES permit.

The Fourth Circuit's recent holding on remand in *Gwaltney* supports our reading of the Supreme Court's discussion of mootness. Following the Supreme Court's remand, the Fourth Circuit discussed the question of mootness for the first time after the district court had awarded civil penalties and defendant Gwaltney again appealed to the Fourth Circuit. In examining the question of mootness, the Fourth Circuit wrote that:

> In our view, the penalty factor keeps the controversy alive between plaintiffs and defendants in a citizen suit, even though the defendant has come into compliance and even though the ultimate judicial remedy is the imposition of civil penalties assessed for past acts of pollution.

*Chesapeake Bay Foundation v. Gwaltney of Smithfield*, 890 F.2d 690, 696 (4th Cir. 1989). The court further held that:

> Under the Clean Water Act, civil penalties attach as of the date a permit violation occurs. Liability is fixed by the happening of an event (discharge of effluent with an excessive burden of pollution) that occurred in the past. Thus, the initiation of § 1319 actions by the government can be based on wholly past violations, so that a suit seeking penalties is intrinsically incapable of being rendered moot by the polluter's corrective actions....

and penalties if they show a "continuing likelihood of a recurrence in intermittent or sporadic violations." *Gwaltney,* 844 F.2d 170, 172 (4th Cir.1988).

13. The United States argues amicus curiae that ASLF's claim for injunctive relief is not moot because as long as Tyson continues to discharge wastewater from its Blountsville plant there remains the possibility that it may discharge pollutants in violation of its NPDES permit. We reject the government's suggestion that Tyson should only escape the imposition of an injunction if it ceases discharges altogether. The law does not require a defendant to show that there is no conceivable chance that a future violation will occur, but only that "there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

A similar rationale governs our consideration of putative mootness arguably brought on by corrective action after a § 1365 citizen suit has been initiated. When the Supreme Court concluded in its *Gwaltney* decision that § 1365 permits citizens' actions against polluters while there are ongoing violations, the Court effectively approved the assessment of penalties based on past violations (the only possible basis for assessing a penalty). Assuming, then, proof of an ongoing violation, a citizen action, like a government action, cannot become moot once there is an assessment of civil penalties, so long as the penalties are for past violations that were part of or which contiguously preceded the ongoing violations.

*Id.* at 696–97. Although the *Gwaltney* court did not state so explicitly, it is clear from the opinion that the term "ongoing violations" refers to the time the suit was filed and not the time of trial.[14] Thus, the Fourth Circuit also has concluded that for purposes of mootness, the relevant question is whether there was a basis for injunctive relief at the inception of the suit, and not when a jury or the court decides the merits of the suit.[15]

Our holding finds further support in *Public Interest Research Group v. Carter–Wallace, Inc.*, 684 F.Supp. 115 (D.N.J. 1988). In *Carter–Wallace*, the district court, in discussing the relationship between injunctive relief and civil penalties, stated that:

> While the *Gwaltney* court did indeed stress the prospective nature of citizen suits, that prospective nature was stressed only as a limitation on the jurisdictional basis of those suits. When a citizen suit is properly commenced, as it was here, *Gwaltney* does not limit the relief which § 1319(d) affords the citizen group to only present and prospective penalties.

*Id.* at 119. The court opined that because the question of injunctive relief was no longer at issue in *Gwaltney*, the Supreme Court would have remanded only if pre-complaint violations could properly be the subject of civil penalties in a civil suit. *Id.*

## IV.

Our holding is further bolstered by the policies underlying the citizen suit provision of the Clean Water Act and the difficulties that would result if we were to decide the question of mootness of civil penalties by focusing on a date other than the date the complaint was filed.

As the United States points out in its amicus curiae brief, citizen suits are an important supplement to government enforcement of the Clean Water Act, given that the government has only limited resources to bring its own enforcement actions. Courts have noted that "the judicial relief of civil penalties, even if payable only to the United States Department of the Treasury, is causally connected to a citizen-plaintiff's injury. Such penalties can be an important deterrence against future violations." *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1113 (4th Cir. 1988). If post-suit compliance results in a mooting of the suit for civil penalties, then

---

**14.** For example, the court refers to the district court's finding that "Gwaltney was guilty of an ongoing violation at the time suit was filed." 890 F.2d at 697.

**15.** A concentration on the time the complaint was filed is evident throughout the opinions construing the Supreme Court's decision in *Gwaltney*. See *Gwaltney*, 844 F.2d at 172 (important question for district court to consider is whether the risk of defendant's continued violation had been completely eradicated when citizen-plaintiffs filed suit). Likewise, when the court in *Sierra Club v. Union Oil Company of California* noted that the Fourth Circuit "linked proof of ongoing violations to the Supreme Court's discussion of mootness in *Gwaltney*" it obviously understood "ongoing violations" as referring to the defendant's conduct at the time the citizen-plaintiffs filed suit. 853 F.2d 667, 671 (9th Cir.1988). In *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109 (4th Cir.1988), the court also assumed that proof of violations at the time the complaint was filed was sufficient basis for relief under *Gwaltney*. The court stated that "[b]ecause we conclude that Simkins' violations continued past the date Sierra Club filed its complaint, we do not reach the issue of whether they were intermittent or episodic violations which did not cease to be continuous within the meaning of *Gwaltney*." *Id.* at 1115.

citizens will have less incentive to bring suit since they know that the case may be deemed moot and dismissed before judgment. The potential for a citizen suit also will become a less effective deterrent to violators, since they know that they may be able to avoid paying *any* penalties by post-complaint compliance.

Perhaps the most dangerous result of the district court's holding is that it encourages violators to delay litigation as long as possible, knowing that they will thereby escape liability even for post-complaint violations, so long as violations have ceased at the time the suit comes to trial or is decided on summary judgment. Under such a holding, dischargers could intentionally violate the Clean Water Act until they are sued and then obtain a stay while continuing their violations until they eventually are in compliance with the law. At this point, the case would be dismissed and they would have escaped all penalties. The district court's understanding of mootness reads the civil penalties provision out of the Clean Water Act. Further, under the district court's opinion, whether or not a suit is mooted may depend on when the district court happens to set the case down for trial or rule on summary judgment motions.

In this regard, the history of the present litigation is instructive. The complaint was filed in August of 1987. One month later, the court stayed discovery. Meanwhile, Tyson continued to violate its permit limitations for the next five months, until early February. In March, the court stayed the proceedings *again*, this time in order to allow Tyson more time to upgrade its facilities. Finally, the court lifted the stay in July of 1988, approximately one year after the suit was filed. In March of 1989, nine months later, the court granted summary judgment in favor of Tyson. Given the stays imposed by the court, it was impossible for the plaintiffs to have the merits of their suit decided while the violations were ongoing. Indeed, the second stay was imposed for the precise purpose of giving Tyson time to come into full compliance.

We cannot believe that *Gwaltney* allows a district court to determine the outcome of citizen suit litigation by staying the proceedings. Here, the district court's actions served to assist the defendant in having the case dismissed as moot.[16]

### V.

Having decided that Tyson's claim for civil penalties is not moot, we must now rule on the district court's alternate holding that even if the case is not moot, the court nevertheless would abstain from imposing any penalties pursuant to its equitable powers. To rule on this holding, we turn to the penalty provisions of the Clean Water Act.

### A. Determination of Penalties Under the Clean Water Act

In deciding upon the penalty to be assessed against a defendant who has violated its NPDES permit, the point of departure for the district court should be the maximum fines for such violations permitted by the Clean Water Act. Although the amount of the maximum fine is stated at 33 U.S.C. § 1319(d), the language of that section as originally written and as amended is not a model of clarity. Indeed, it leaves several questions regarding the calculation of fines unresolved.

Although it would be possible for the district court to resolve these questions on remand, we note that the questions, which involve statutory interpretation, are legal and not factual in nature. Thus, given the lack of Eleventh Circuit law in the area, we set forth our interpretation of the controlling statute in order to provide the court with guidance on remand.

Until February 4, 1987, 33 U.S.C. § 1319(d) stated that:

> Any person who violates sections 1311, 1312, 1316, 1317, 1318, 1328, or 1345 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of

---

**16.** Because we find that the court erred in holding that ASLF's request for civil penalties was moot, we do not rule on the question of whether the district court abused its discretion in staying proceedings to allow Tyson to come into compliance with the Clean Water Act.

this title by the Administrator, or by a State, or in a permit issued under section 1344 of this title by a State ... *shall be subject to a civil penalty not to exceed $10,000 per day of such violation.*

(emphasis added). The Clean Water Act was amended by the passage of the Water Quality Act of 1987, Pub.L. No. 100–4, 101 Stat. 7 (1987). The amendment to section 1319(d), effective February 4, 1987, changed the italicized language to state that a violator "shall be subject to a civil penalty not to exceed $25,000 per day for each violation." As Tyson's permit violations occurred both before and after the amendment, maximum penalties must be assessed in accordance with both the pre- and post-amendment language of the statute.

1. *Maximum penalty per day where multiple violations occur on a single day*

In interpreting the language of section 1319(d), courts have come to different conclusions as to whether the pre-amendment Clean Water Act limits a permittee's liability to $10,000 per day even if a permittee has violated discharge limitations for several pollutants on the same day. The district court's initial decision in *Gwaltney* includes a lengthy discussion of this question. That court, following the decision in *United States v. Detrex Chemical Industries, Inc.*, 393 F.Supp. 735 (N.D.Ohio 1975) held that "Section 1319(d) authorizes a maximum of $10,000 per day in civil penalties for violations that are enumerated therein, even where the defendant has violated discharge limitations for several substances during the same day." 611 F.Supp. 1542,

1555 (E.D.Va.1985). The *Gwaltney* court noted that the statute is ambiguous, but felt that a construction that capped liability at $10,000 per day "accurately reflect[ed] the intent of Congress" and would provide "a substantial deterrent against violations by even the largest corporations where more than a few days of violation are involved." *Id.* In *United States v. Amoco Oil Co.*, 580 F.Supp. 1042, 1047 n. 1 (W.D. Mo.1984), the district judge, in dicta, construed the language of section 1319(d) to allow for separate penalties for violations of the daily limit for two or more different pollutants, and in *Student P.I.R.G. of New Jersey, Inc. v. Monsanto Co.*, CIV.A. No. 83–2040 (D.N.J. March 24, 1988) (1988 WL 156691), the court reached the same conclusion.[17] The EPA has taken a similar position, stating in its internal document entitled "Clean Water Act Penalty Policy For Civil Settlement Negotiations" ("Penalty Policy") that "violations of different parameters at the same outfall are to be counted separately."[18]

We agree with the district court in *Gwaltney* that the statutory language of section 1319(d) as originally written is ambiguous and find the varying interpretations given to that language equally plausible. In amending the statute, however, Congress specified that the penalties were not to exceed "$25,000 per day *for each violation*" (emphasis added). This language, applicable to violations occurring after February 4, 1987, is, we find, capable of only a single reasonable interpretation: the daily maximum penalty applies separately to each violation of an express limitation.[19] Certainly then, for violations oc-

---

**17.** The *Monsanto* court stated that:

Each violation of any express limitation in the permit may, of course, be treated as a separate violation for the purposes of assessing a penalty. Thus, if on a particular day, based on samples tested, a computation was made that established an excessive TSS discharge and an excessive oil and grease discharge, a penalty of up to $10,000 could be imposed on each of the excessive discharges, or a total of $20,000 for that day.

CIV. A. No. 83–2040, 1988 WL 156691.

**18.** For a discussion of the EPA's Penalty Policy see note 23 below.

**19.** In addition, the amended statute also states: "For purposes of this subsection, a single operational upset which leads to simultaneous violations of more than one pollutant parameter shall be treated as a single violation." 33 U.S.C. § 1319(d). The necessity of spelling out this exception implies that the rule is to treat violations of different pollutant parameters as distinct violations.

"Upset" is a term of art referring to an exceptional incident and does not include noncompliance due to improperly designed or inadequate treatment facilities. 40 C.F.R. § 122.41(n)(1) (1988).

curring after February 4, 1987, there is no daily cap of $25,000. Instead, *each* excessive discharge of a pollutant on a given day will subject the polluter to a $25,000 maximum fine.

We further find that the slight change in wording in the 1987 amendment points to the proper interpretation of the statute as originally written. The Conference Report accompanying the amendment makes clear that under the Senate bill, section 309 of the Act 33 U.S.C. § 1319 was amended in part "to increase the civil judicial penalty limit from $10,000 to $25,000 per violation, [and] *to clarify that each distinct violation is subject to a separate daily penalty assessment of up to $25,000....*" H.R. Rep. No. 99–1004, 99th Cong., 2d Sess. 132 (emphasis added).

Congress' indication that it intended by its amendment simply to "clarify" the language in the statute as previously written convinces us to follow the *Amoco* and *Monsanto* courts' reading of the pre-amendment language and to find that Congress intended the fines to attach to each violation of an effluent limitation separately.

### 2. *Calculation of the penalty for violation of a monthly average*

█ Another difficulty that courts have faced is the proper way to calculate the penalty for a violation of a monthly average. For each "effluent characteristic" the NPDES permit lists both a "daily maximum discharge limitation" and a "daily average discharge limitation." The "daily maximum" is defined by the permit as the highest value of a sample result obtained during a single day. The "daily average" is defined as the arithmetic mean value of all sample results for a particular pollutant obtained during a calendar month. Typically, the daily average discharge limitation for the month is much lower than the daily maximum, reflecting the fact that harm may be done in the aggregate even when the defendant stays within the maximum limitations for each day.

The language of the statute does not make clear whether the penalty for a monthly violation [20] should consist of a fine for each day of that month or of a single fine of $10,000 (or $25,000). In *Gwaltney*, the Fourth Circuit agreed with the district court's holding that a violation of a monthly average should be deemed to involve a violation of each of the days of that month. 791 F.2d 304 (4th Cir.1986). The court reasoned that:

> While the statute does not address directly the matter of monthly average limitations, it does speak in terms of penalties per *day* of violation, rather than penalties per *violation.* This language strongly suggests that where a violation is defined in terms of a time period longer than a day, the maximum penalty assessable for that violation should be defined in terms of the number of days in that time period.

*Id.* at 314 (emphasis in original). Thus, under the *Gwaltney* court's reading of the pre-amendment statute, violating a monthly limitation in a month with thirty days would subject a polluter to a maximum penalty of $300,000 per pollutant. Under the statute as amended, a polluter would be subject to a maximum penalty of $750,000 for that month. The EPA agrees in its Penalty Policy that "violation of a monthly average effluent limitation should be counted as 30 violations." *But see, Monsanto,* CIV.A. No. 83–2040, 1988 WL 156691 (holding that a violation of the daily average should *not* be applied to every day that month, but should only be counted as a single violation).

We find the reasoning of the Fourth Circuit persuasive and consistent with the language of section 1319(d). Although the maximum penalty for a monthly violation may seem high, we note, as did the *Gwaltney* court, that section 1319(d) only serves to set a maximum penalty. In choosing the correct penalty to be awarded, the district court may take into account the reasons why the daily average limitation was violat-

---

**20.** For purposes of discussion, a violation of the daily average will be referred to as a "monthly violation" to differentiate it from a "daily viola-

tion" which refers to a violation of a daily maximum.

ed in a particular month. For instance, one polluter may violate its daily average because it discharges just below the limit of the daily maximum every day of the month.[21] Another polluter may violate the daily average because it has an excessive discharge on a single day. It may be appropriate for the district court to assess higher penalties for the polluter engaging in high discharges on a daily basis than for the polluter who violates the monthly limitation because of a single discharge.

### 3. *The interaction of daily and monthly violations*

A final question that must be resolved is whether the imposition of penalties for a monthly violation forecloses penalties for daily violations within that month. Based on its holding that $10,000 was an absolute maximum per day regardless of the number of violations, the district court in *Gwaltney* held that no penalties for violations of the daily maximum should be imposed for months in which the polluter violated the monthly average. 611 F.Supp. at 1555.

■ As noted above, we do not read the pre- or post-amendment language to impose an absolute ceiling on the amount of penalties that may be imposed on a single day. However, we find that because discharge of a single pollutant may be the cause of both daily and monthly violations, fining the violator twice may result in imposing two fines for the same illegal act. We decline to interpret the statute to create this result. Thus, if a polluter is guilty of violating the daily average discharge limitation of pollutant A, and also violates the daily maximum limitation of only pollutant A, then the maximum fine for discharge of pollutant A would be $10,000 (or $25,000) times the number of days in the month. If, however, the polluter also violates the daily maximum of pollutant B, one would add

each of those daily violations to the fine for the monthly violation of pollutant A.[22]

### B. The District Court's Refusal to Award Penalties

■ The district court, after noting that it sits as a court of equity that may exercise judicial discretion in all cases, held that "it would hardly be fair and just to impose civil penalties upon Tyson when in fact it has at all times herein acted in good faith." Slip op. at 9.

Tyson argues that the Supreme Court has approved the exercise of discretion by district courts to balance the equities in deciding penalties under the Clean Air Act. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). In *Romero–Barcelo*, plaintiffs brought suit against the Navy for discharge of ordnance in alongshore waters. The Supreme Court affirmed the district court's use of discretion in declining to enjoin naval operations pending compliance with the Clean Water Act where the Court found great harm to the Navy and little harm to the environment. We find that the holding of *Romero–Barcelo* has little bearing in the instant case, as it speaks to the district court's discretion to refuse to issue an injunction and not to the question of penalties.

In the case of civil penalties, a district court's discretion is constrained by Congress' enumeration of factors to be considered when assessing such a penalty. Under the 1987 amendments to the Clean Water Act, Congress stated that:

In determining the amount of a civil penalty the court *shall consider* the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the vio-

---

**21.** As the amount of discharge allowed under the daily average limitations is in general substantially less than the daily maximum limitations, frequent discharges close to the daily maximum would probably result in a violation of a monthly limitation.

**22.** In addition, if a polluter violates the monthly average for both pollutant A and pollutant B, there is no bar to a maximum fine of $10,000 (or of $25,000) times the number of days in the month *for discharge of each pollutant.*

lator, and such other matters as justice may require.

33 U.S.C. § 1319(d) (emphasis added). Congress' use of the words "shall consider" suggests that in arriving at a dollar figure for penalties, the court is to take each listed factor into account as well as any additional factors the court feels have bearing on the question of penalties. The legislative history also notes that Congress intended to "expressly require the courts to consider [these factors]." H.R.Rep. No. 99–1004 at 132. *See also, Tull v. United States*, 481 U.S. 412, 422 n. 8, 107 S.Ct. 1831, 1838 n. 8, 95 L.Ed.2d 365 (1987).

From a reading of the district court's opinion in the instant case, it appears that the court focused solely on the good faith of the defendant in determining that the plaintiffs were entitled to no award of civil penalties. The court concluded that "[i]t would simply be inequitable and unconscionable to impose civil penalties against Tyson when it has displayed the utmost good faith." In support of its finding of good faith, the court noted that upon acquiring the plant from Spring Valley, Tyson immediately began building a state-of-the-art wastewater treatment system. It also noted that Tyson expended over $2.5 million to correct the past violations of its predecessor and that it did so without having been ordered to comply by any court or administrative agency.

There is no evidence that in determining penalty amounts the court examined the economic benefit to the violator or the seriousness of the violations. Insuring that violators do not reap economic benefit by failing to comply with the statutory mandate is of key importance if the penalties are successfully to deter violations. Although there is little evidence in the record on the question of economic benefit, testimony from the deposition of Mark Waller, the former plant manager at the Blountsville facility, indicates that Tyson may have saved over $400,000 in operation and maintenance expenses by operating without utilizing the technology and employees necessary to comply with its permit.

In *Tull v. United States*, 481 U.S. 412, 422–25, 107 S.Ct. 1831, 1838–39, the Supreme Court made clear that economic gain and restoration of the status quo is not the only basis on which penalties should be awarded under the Clean Water Act. In addition, the penalties are designed to punish violators for their non-compliance and to serve the goal of retribution. The *Tull* Court, citing the EPA Penalty Policy, stated that retribution can be based on "the seriousness of the violations, the number of prior violations, and the lack of good-faith efforts to comply with the relevant requirements." *Id.* at 423, 107 S.Ct. at 1838. Here, there is ample evidence that Tyson engaged in repeated violations which continued well after the complaint was filed.

■ In its order, the district court also stressed that ASLF filed suit against Tyson well after construction of the facility had begun and without investigating the status of the facility. It found that ASLF's attempts to gather information on which it based its complaint indicated a lack of diligence. While the statute allows the court to consider "other matters as justice may require," we have difficulty understanding how the due diligence of the citizen-plaintiffs fits into the calculus of penalties. Inclusion of this factor is particularly troubling when the court prevented the plaintiffs from gathering information by imposing a stay of discovery on the merits for nearly two years after the complaint was filed. On remand, therefore, the district court's perception of the efforts of ASLF to secure information should play no role in its calculation of the appropriate fine.

The district court concluded that "Congress could not have intended for the Clean Water Act to be used as an instrument to generate fines from parties which have made a bona fide effort to bring their operations into compliance with the Act, especially if they did so before a complaint was filed." We disagree. There was one simple and straightforward way for Tyson to avoid paying civil penalties for violations of the Clean Water Act: After purchasing the plant, Tyson could have ceased operations

until it was able to discharge pollutants without violating the requirements of its NPDES permit. Tyson chose not to do this and it must now bear the consequences of that decision.

ASLF claims that under the statute, pre-complaint violations in this case involve a maximum penalty of over $14 million and post-complaint penalties involve maximum penalties in excess of $9 million. Without passing judgment on the correctness of these assessments, we note that section 309(d) of the Clean Water Act states that "[a]ny person who violates ... any permit condition or limitation ... *shall be subject to a civil penalty....*" This language makes clear that once a violation has been established, some form of penalty is required. In *Stoddard v. Western Carolina Regional Sewer Authority*, 784 F.2d 1200, 1208 (4th Cir.1986) the court stated that "[c]learly, a fine must be imposed when the violations have been as pervasive as those perpetrated by the [defendant] during the extended period from 1978 to 1983. We hold that the district court committed an error of law by failing to assess civil penalties in some amount." We agree with the *Stoddard* court. Civil penalties are to be assessed against Tyson as a matter of law. While the amount of penalty to be levied is discretionary with the district court, its determination, based solely on the good faith efforts of Tyson to comply with the law, that no penalty was appropriate was and would be an abuse of discretion.

Upon remand, the district court should first determine the maximum fine for which Tyson may be held liable. If it chooses not to impose the maximum, it must reduce the fine in accordance with the factors spelled out in section 1319(d), clearly indicating the weight it gives to each of the factors in the statute and the factual findings that support its conclusions. While the court may find the EPA's Penalty Policy helpful in determining the appropriate fines, the court's primary focus should be on the statutory language of section 1319(d).[23]

## VI.

 Section 1365(d) of 33 U.S.C., as amended on February 4, 1987, states that:

The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate.

As the district court ruled against ASLF on the merits, it did not discuss whether ASLF would be entitled to an award of costs and attorney fees. However, in its earlier opinion on the question of standing, the court stated that it felt:

compelled to note that an award of attorney's fees under section 1365(d) may well prove to [sic] inappropriate. ASLF will have great difficulty in establishing itself as a prevailing or substantially prevailing party, for it appears on the present record that Tyson had undertaken to make the changes in its Blountsville plant prior to the filing of the instant action.

---

**23.** In the 1970's, the EPA developed a "Penalty Policy for Civil Settlement Negotiations" containing a fairly involved "calculation methodology" for determining settlement penalties. It appears that Congress took note of the factors listed in the policy when it amended 33 U.S.C. § 1319(d) to require courts to take account of certain specified factors when determining civil penalty awards.

Before the February 1987 amendment, some courts relied on the methodology of the Penalty Policy in determining appropriate penalties. *See, e.g. Gwaltney*, 611 F.Supp. at 1556 (finding EPA penalty policy "a helpful analytical framework for arriving at a civil penalty, particularly given the lack of congressional guidance.").

More recently, courts have either used the penalty policy as an additional resource in calculating penalties, *see PIRG v. Powell Duffryn Terminals, Inc.*, 720 F.Supp. 1158, 1166 (D.N.J.1989) (in applying statutory penalty factors set forth in the Clean Water Act, court will consider the EPA's Penalty Policy) or have decided not to rely on the policy. *See Monsanto*, CIV.A. No. 83–2040, 1988 WL 156691 (finding EPA methodology for settlement of civil penalties inapplicable to judicial determination of penalties after trial); *Proffitt v. Lower Bucks County Joint Municipal Authority*, CIV.A. No. 86–7220 (E.D.Pa. May 12, 1988) (1988 WL 48552) (declining to base findings regarding penalty on EPA policy).

682 F.Supp. at 1190. Although the language of the statute makes clear that an award of fees is not mandatory, we note that on remand ASLF should be considered a prevailing party despite the fact that Tyson may have taken certain actions towards compliance before the filing of the instant suit. ASLF prevailed in that it was able to show that Tyson was liable for civil penalties for violations of the Clean Water Act. Civil penalties are an integral part of the enforcement scheme of that Act. As the Fourth Circuit noted in *Stoddard:*

> The [plaintiffs] have pursued and obtained remedies under the Act in the manner provided for by section 1365, and their actions will tend to ensure compliance with the Act in the very manner contemplated by Congress in enacting this provision. Therefore, the landowners have served the public interest by insisting that the Clean Water Act be adequately enforced.

784 F.2d at 1209 (citations omitted). The award of fees is within the discretion of the district court; however, the sound exercise of that discretion will not allow the court to deny fees and costs absent good cause. In a case like the instant one, where a citizens group has succeeded on the merits, we cannot conceive of any grounds that would justify a denial of fees and costs.

In *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292 (11th Cir.1988), this court stated that "[t]he court's order on attorney's fees must allow meaningful review—the district court must articulate the decisions it made, give principled reasons for those decisions, and show its calculation. If the court disallows hours, it must explain which hours are disallowed and show why an award of these hours would be improper." *Id.* at 1304. That same decision clearly spells out the Eleventh Circuit's understanding of the analysis required under recent Supreme Court decisions for determining proper attorney's fee awards. *Id.* at 1299–1304. We thus refer the district court to *Norman* as a guide to the proper analysis of attorney's fees in this case. In addition, the parties should be given full opportunity to brief questions relating to an appropriate fee award.

## CONCLUSION

As the evidence of Tyson's violations of its NPDES permits is uncontroverted, and the court's ability to impose civil penalties survives the mooting of injunctive relief, we reverse the district court's entry of summary judgment in favor of Tyson and direct the court to enter summary judgment on the question of liability in favor of ASLF. We remand to the district court for the limited purpose of calculating penalties based on Tyson's violations of its NPDES permit from the time it began operating the plant until it came into compliance in February of 1988 and for the purpose of calculating reasonable attorney's fees.

In calculating penalties, the district court shall consider and explain its finding on each of the factors enumerated in 33 U.S.C. § 1319(d). The court shall receive additional evidence from both parties on all factors as necessary, including but not limited to the exact number of daily and monthly violations for which Tyson is responsible, the speediness with which Tyson complied with the Clean Water Act, expenditures undertaken by Tyson to comply with the Act, and Tyson's increased economic gain from non-compliance. We also direct the court to grant ASLF's request for attorney's fees and costs, keeping in mind that ASLF is to be considered a "prevailing party" within the meaning of the Clean Water Act. The court is directed to make the above determinations as set forth in this limited remand within 120 days from the issuance of this opinion.

REVERSED and REMANDED.