**ATLANTIC STATES LEGAL FOUNDATION INC.,**
Plaintiff,

v.

**UNIVERSAL TOOL & STAMPING CO., INC., Defendant.**

No. F 87–95.

United States District Court, N.D. Indiana, Fort Wayne Division.

March 13, 1992.

---

**2.** Neither party explains to the Court exactly how Ziegler came into possession of the Margin

Agreement in question.

Peter G. Mallers II, Fort Wayne, Ind., Richard J. Kilsheimer, Kaplan Kilsheimer & Foley, New York City, for plaintiff.

Milford M. Miller, Edward J. Liptak, Livingston, Dildine, Haynie & Yoder, Fort Wayne, Ind., for defendant.

## MEMORANDUM DECISION AND ORDER

WILLIAM C. LEE, District Judge.

On April 23, 1990, this court awarded partial summary judgment to plaintiff Atlantic States Legal Foundation, Inc., 735 F.Supp. 1404, ("Atlantic States") on the issue of defendant Universal Tool & Stamping Company's, ("Universal Tool") liability for discharging excessive amounts of pollutants in violation of its permit limitations under provisions of the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. § 1365. The matter of the appropriate relief to be granted was tried before this court from January 13 through January 17, 1992. The following Findings of Fact and Conclusions of Law are entered pursuant to Federal Rules of Civil Procedure 52(a), after examining the entire record and determining the credibility of the witnesses.

## FINDINGS OF FACT

Plaintiff is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business in Syracuse, New York, with members in the State of Indiana. Plaintiff is dedicated to protecting and restoring the natural resources, particularly the water resources of the United States.

Defendant, Universal Tool, manufactures automotive jacks at a plant located at Butler, Indiana, and employs approximately 400 people. The manufacturing process involves machining bar and flat stock steel into automotive jacks. During the relevant time period involved in this litigation, the automotive jacks went through a cleaning process followed by one of three finishing processes: zinc plating followed by chrome coating, iron phosphating followed by painting, or zinc phosphating followed by an oil coating. In December, 1989, the zinc plating was discontinued in-house to eliminate the use of the toxic metal chrome.

On January 1, 1974 the Administrator of the Environmental Protection Agency (EPA) authorized the Indiana Steam Pollu-

tion Control Board[1] to issue National Pollutant Discharge Elimination System (NPDES) permits in the State of Indiana, pursuant to Section 402(a) and (b) of the Clean Water Act, 33 U.S.C. § 1342(a) and (b). Universal Tool's effluent discharge was first regulated under a NPDES permit in 1975 and Universal Tool has had various such permits from that time to the present. On April 28, 1984 IDEM issued Universal Tool NPDES Permit No. IN000639, allowing the discharge of pollutants[2] into Teutsch Ditch with specific conditions. Defendant was required to establish and maintain records, install, use and maintain monitoring equipment, sample effluents, and report on a regular basis to IDEM regarding the facility's discharge of pollutants.[3]

■ It is undisputed that Universal Tool has not achieved compliance with its permit limitations. Where a permittee is in violation of an NPDES discharge limitation, it is also "in violation of ... an effluent standard or limitation under [the Act]," 33 U.S.C. § 1365(a)(1), which makes the permittee subject to citizen suits. *Id.* For citizen suits under the Clean Water Act, Congress has authorized the district courts to assess appropriate civil penalties under Section 309(d) of the Act. 33 U.S.C. § 1365(a). Section 309(d), 33 U.S.C. § 1319(d), prior to its amendment in 1987 provided:

> Any person who violates §§ 301, 302, 306, 307 or 308 of this Act [or] any permit condition or limitation implementing any of such sections in a permit issued under § 402 of this Act by the Administrator ... shall be subject to a civil penalty not to exceed $10,000 per day of such violation.

Consequently, each violation of the NPDES permit limitation, prior to the 1987 amendments, subjects the defendant to a statutory maximum penalty of up to $10,000.00 per day of such violation. However, in 1987 Congress increased the statutory maximum penalty of up to $25,000.00 per day of such violation. Therefore, a permittee's violations occurring on or after February 4, 1987 are subject to a penalty of up to a maximum of $25,000.00 per day of such violation.

The parties have stipulated that the specific permit violations that are the subject of this suit are for the period May 1, 1984 through November 30, 1988. Thus, Universal Tool's violations occurring from May 1, 1984 through February 4, 1987 are subject to a penalty of up to a maximum of $10,-000.00 per day of such violation and those violations occurring from February 4, 1987 through November 30, 1988 are subject to a penalty up to a maximum of $25,000.00 per day of such violation.

■ Both parties agree that during the subject period there were 413 violations for exceeding the daily maximum limitation and 53 violations for exceeding the monthly average limitation. However, plaintiff contends that a violation of the monthly average limitation should be counted as a daily violation for each day of that month (i.e. 30 daily violations per month). See *Atlantic States Legal Foundation, Inc., v. Tyson Foods, Inc.*, 897 F.2d 1128, 1139–40 (11th Cir.1990); *Chesapeake Bay Foundation v. Gwaltney of Smithfield Ltd.*, 611 F.Supp. 1542, 1552–53 (E.D.Va.1985), *aff'd*, 791 F.2d 304 (4th Cir.1986), *rev'd and remanded on other grounds*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), *remanded*, 844 F.2d 170 (4th Cir.), *judgment reinstated*, 688 F.Supp. 1078 (E.D.Va.1988), *aff'd in part, rev'd in part and remanded*, 890 F.2d 690 (4th Cir.1989). If there is an average daily violation and a maximum violation for the same parameter during a particular month (e.g., a violation of a month mass loading limitation and of a

1. Now called the Indiana Department of Environmental Management (IDEM).

2. The 1984 permit set effluent limits for six pollutants:
   (1) 5-day Biochemical Oxygen Demand (BOD5)
   (2) Oil and Grease (O & G)
   (3) Total chromium (Cr, T)
   (4) Hexavalent chromium (Cr, +6)
   (5) Zinc (Zn)
   (6) Total suspended solids (TSS)

3. The reports are known as Discharge Monitoring Reports.

daily mass loading limitation for the same parameter) it cannot be counted twice (i.e., it is only counted as 30 daily violations). *Tyson Foods*, 897 F.2d at 1140. Defendants, understandably, take the position that a violation of the daily average should not be applied to every day of the month, but should only be counted as a single violation on those days where the average was exceeded. *See Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Company*, 29 E.R.C. 1078, 1988 WL 156691 (D.N.J.1988).

█ This court agrees with the majority of courts that have ruled on the issue and with the reasoning set forth in the *Gwaltney* decision. The Fourth Circuit reasoned that:

> While the statute does not address directly the matter of monthly average limitations, it does speak in terms of penalties per *day* of violation, rather than penalties per *violation*. This language strongly suggests that where a violation is defined in terms of a time period longer than a day, the maximum penalty assessable for that violation should be defined in terms of the number of days in that time period.

*Id.* at 314 (emphasis original). In addition, the language of section 1319(d) established the methodology for imposing a maximum penalty. Any reasons as to why the monthly average limitation was exceeded (and therefore not to be considered a daily violation for each day of that month) can be factored into the district court's determination of the actual penalty to be imposed. *Tyson Foods*, 897 F.2d at 1139. The court therefore finds that the 53 violations of monthly average limitations will be deemed to involve a violation for each of the days of that month.

The court does not agree with the analysis of the *Monsanto* court. The *Monsanto* court determined that a monthly violation should only establish a single violation on the day of the monitored report. However, that determination was arrived at by taking into consideration mitigating circumstances before a maximum penalty was established. This court believes that in order to comply with the provisions of the Act, the mitigating factors must be considered after the maximum penalty is established. Accordingly, the defendant has violated its permit 1,977 times for a statutory maximum penalty of up to $25,830,000.00.

## I. Mitigating Factors

The penalty of $25,830,000.00 is a maximum penalty, not a mandatory one. Congress intended the penalty to provide a substantial deterrent, however courts were instructed to determine the actual penalty in light of several mitigating factors; including, the seriousness of the violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good faith efforts to comply with the application requirements, the economic impact of the penalty on the violator, and such other matters as justice may require. 33 U.S.C. § 1319(d).

### A. *Seriousness of the Defendants Violations*

Notwithstanding the sheer number of violations by the defendant, the court finds there has been minimal environmental damage as a result of the violations. *See United States of America v. Roll Coater, Inc.*, 21 Envtl.L.Rep. 21073, 1991 WL 165771 (S.D.Ind.1991) [lack of harm as a mitigating factor not foreclosed by changes in the standard in determining liability]. The results of a three year field investigation [4]

---

4. The data was complied in the following subject areas:
(1) Data on the physical characteristics of Teutsch Ditch and Big Run Creek including stream flow and sediment type and quality.
(2) *In situ* water quality measurements designed to provide a "snapshot" of surface water conditions (e.g. flow, temperature, dissolved oxygen during August 1989 and July 1990).

(3) Analysis of water chemistry for surface water samples and sediment samples collected from both Teutsch Ditch and Big Run Creek to determine whether in stream conditions in August 1989 and July 1990 met water quality standards.
(4) Presentation of similar surface water quality data collected in 1988 by Englo Labs, permitting

concluded that any quantifiable impact from Universal Tool's discharge was limited to that portion of Teutsch Ditch between Universal Tool's discharge point and the confluence of Teutsch Ditch and Big Run Creek.[5] However, no evidence indicated that these conditions were being carried to Big Run Creek and the St. Joseph River. In fact, high levels of contaminants were found in Teutsch Ditch upstream of Universal Tool's discharge point, suggesting that there were significant point and non-point sources of pollutants in addition to Universal Tool.[6] But even with the multiple pollution sources entering Teutsch Ditch, sufficiently high water quality existed in the lower portions of Teutsch Ditch to support a permanent community of aquatic biota.

Finally, the studies revealed that an aquatic ecosystem is influenced by many factors, including flow and water quality. Teutsch Ditch is dry during certain parts of the year, therefore, a proper assessment of Universal Tool's discharge could only occur if this variable were taken into consideration.[7]

The plaintiff's evidence on the condition of Teutsch Ditch was not as favorable as what was presented by the studies conducted by ITC. Dr. Phillip Ross, an Aquatic Toxicologist at the Illinois Natural History Survey, reviewed various documents and concluded that with respect to surface waters, the pattern of repeat permit exceedances suggested that conditions in

Teutsch Ditch were frequently unsuitable for the maintenance of aquatic life. Due to contaminant transport, the discharge into Teutsch Ditch created the potential for downstream affects to the aquatic life in Big Run Creek. With respect to the sediment sampling, Dr. Ross concluded that heavy metals from Universal Tool's discharge were responsible for the degradation of sediment conditions in Teutsch Ditch. Further, the lack of distinct upstream-downstream differences in colonization experiments indicated that the observed impacts on benthic community structure was due to sediment contamination, rather than physical habitat differences as characterized by the ITC studies. The possibility of the contaminants in Teutsch Ditch adversely impacting Big Run Creek could not be excluded, especially since a major source of food for predatory organisms is the drift of prey food from upstream reaches. Consequently, Dr. Ross concluded that conditions that reduce the amount of diversity of invertebrate community production in Teutsch Ditch sediments below the Universal Tool discharge could potentially reduce food availability in downstream reaches of Teutsch Ditch and in Big Run Creek.

The court does not find Dr. Ross' conclusions credible. First, while Dr. Ross examined several documents before coming to his conclusions, all the documents were second hand information, whereas the ITC re-

analysis of trends in water quality over a three year (1988–90) period.

(5) Collection of representative samples of benthic organisms from the sediments and natural substrates of Teutsch Ditch and Big Run Creek to determine the type, number and diversity of aquatic biota, as well as their tolerance to varying degrees of water pollution.

(6) Collection of benthic organisms using artificial substrates suspended in the water column. This sample collection technique is designed to illustrate the type, number, and diversity of organisms that are dependent upon water quality conditions, as opposed to the availability of suitable habitat along the sides and the bottom of the stream.

5. Based upon the data before the court, it was not possible to distinguish between the environmental impact caused by the Universal Tool's discharge that was within the permit levels and the environmental impact caused solely by Universal Tool's exceedances. In fact, defendant's Exhibit O compared allowable pounds per year for each parameter per the NPDES permit (for the relevant permit period—1984–1988), to the actual pounds per year discharged by Universal Tool. In each case Universal Tool discharged overall far less than it could have legally under the NPDES permit.

6. Bohn Aluminum, a point source of pollutants located upstream of Universal Tool, is also regulated by a NPDES permit. Additionally, Teutsch Ditch, in the area of Universal Tool, is crossed by several non-point sources, including, the Penn Central Railroad, McCoulough Road, U.S. Highway 6 and County Route 61A.

7. The studies suggested that if Universal Tool had been stationed upon a larger or steady waterway there would have been a significant decrease in the number of violations.

ports were based upon three years of on-site testing. Second, Dr. Ross' conclusions were clearly refuted by Michael Murray, an aquatic biologist with ITC.

Mr. Murray questioned where Dr. Ross obtained his data. According to the studies conducted by ITC (See Exhibit E, table 2 and 3), with regard to hexavalent chromium, no samples exceeded surface water quality criteria during the three sampling periods. With respect to BOD, oil and grease and zinc, while there were some elevated concentrations found, the concentrations were as great or greater upstream of Universal Tool's discharge.

Additionally, while the sediment data indicated concentrations of chromium and zinc in downstream sediments, contaminated sources were found upstream of Universal Tool's discharge. In fact, the highest concentration of chromium and zinc was found downstream of Highway 6's discharge and upstream of Universal Tool. There was no elevated sediment toxicity found in Big Run Creek.

Mr. Murray found there was insufficient data to suggest that toxicity of sediment exhibited below Universal Tool's discharge was from Universal Tool. The reference station relied on by plaintiff's was taken so far upstream of Universal Tool that there were any number of potential sources that could have added toxicity to the sediments.

Moreover, Dr. Murray maintained that the nature of sediments downstream was the controlling factor for the particular types of benthos that could have existed there. The five organic sediments found had very low diversity value and no evidence existed to connect toxic concentrations to those levels. Similar diversity values and similar percentages of intolerant organisms were found above and below the confluent of Teutsch Ditch. Consequently, no evidence existed that supported Dr. Ross' conclusion that the contaminants from Universal Tool's discharge reduced the amount of diversity of invertebrate community production, which in turn reduced food availability in downstream

reaches of Teutsch Ditch and in Big Run Creek. Accordingly, the court will consider the lack of material environmental harm as a significant mitigating factor.

### B. *Economic Benefit*

The court must next consider the economic benefit to Universal Tool resulting from its non-compliance with its NPDES permit. The implication is that unless the company is fined an amount at least as great as the economic gain in not complying with the regulations, the statute serves little deterrent value. *Roll Coater*, 21 Envtl.L.Rep. 21073.

Dr. Donald Hughes, Environmental Engineer with Atlantic States, opined that Universal Tool's approach to wastewater treatment has been "little more than hit or miss." After a review of defendant's wastewater treatment facility, IDEM files and defendant's responses to interrogatories, Dr. Hughes concluded that he could not find a rational analysis for Universal Tool's wastewater scheme. There was insufficient influent data which could have provided Universal Tool's wastewater engineer with a competent basis for designing a treatment system. Neither was there any treatability data, in which the effectiveness of a specific treatment process could be evaluated.

Dr. Hughes argued that as further proof of defendant's "hit or miss" strategy, the wastewater plant assessment prepared by Lougheed & Associates, identified only BOD5, hexavalent chromium and zinc as pollutants of concern. The report failed to identify TSS and total chromium as pollutants of concern, even though Universal Tool had violated its permit limits for these parameters prior to the issuance of the report. Dr. Hughes determined that Universal Tool never installed a treatment system capable of producing an effluent quality necessary to meet its permit limitations on a consistent basis.

Dr. Hughes concluded that based upon the type of industrial waste that defendant has and the technology available, Universal

Tool should have installed an ultrafiltration system.[8]

Furthermore, it was Dr. Hughes' position that an ultrafiltration system should have been installed as early as 1984. Dr. Hughes argued that the installation and proper operation of such a system would have enabled Universal Tool to eliminate or minimize the amount of BOD, Zinc, Oil and Grease and TSS being discharged into Teutsch Ditch. Dr. Frederick Menz, an economist for Atlantic States, relying on the study conducted by Dr. Hughes, estimated that as a result of not installing appropriate pollution controls, the economic benefit to Universal Tool was between $1 million and $2.5 million.

The court does not find Dr. Hughes' report credible. On cross-examination, it was clear that Dr. Hughes' assessment of Universal Tool's wastewater system was inadequate. Dr. Hughes made only one visit to Universal Tool's plant and conducted only one day of testing (as opposed to the three year study conducted by ITC). Dr. Hughes admitted that time and budget constraints limited his ability to do any more than a cursory analysis of Universal Tool's discharge of pollutants.

Dr. Hughes further testified that his function was not to design a system for defendants but to select a technology based system that would have produced an effluent quality necessary to meet Universal Tool's permit limitations. However, the court finds that there is a substantial question as to whether Dr. Hughes possesses the qualifications to state which system would be better suited for the defendant when he had never designed a wastewater system, particularly for a manufacturing process utilizing metal plating.

Furthermore, Dr. Hughes lacked a knowledge of the particulars of Universal Tool's discharge and wastewater system.

Dr. Hughes was not aware of the type of BOD Universal Tool discharges. Nor was he aware that there are ultrafiltration systems which are not effective against certain types of BOD. The EPA report that Dr. Hughes used to support his conclusion that an ultrafiltration system was the appropriate system, did not even mention the type of BOD found in Universal Tool's wastewater. Thus, an installation of an ultrafiltration system in 1984 by defendant would not have corrected Universal Tool's problem with its BOD permit limitations.

■ What Dr. Hughes failed to take into consideration in his assessment of Universal Tool was that Universal Tool consultants test piloted the ultrafiltration system and recommended that it be rejected as inadequate. The issue was not whether the defendant has a malpractice suit against their consultants for improperly rejecting an ultrafiltration system, but whether Universal Tool enjoyed an economic benefit in not installing the appropriate system. Clearly, the defendant's consideration of the ultrafiltration system and ultimately, the selection of a Lamella clarifier in February 1988 at a cost of $131,357.16, (a cost not substantially less than an ultrafiltration system), negates any alleged purposeful behavior to avoid the costs of complying with the NPDES permit. The evidence was uncontroverted that Universal Tool, without exception, followed the recommendations of its consultants and installed every piece of equipment its consultants recommended.

Lastly, Dr. Menz relied upon the Hughes report to support his conclusions as to the economic benefit that Universal enjoyed. The Hughes report estimated avoided costs for a 37.5 gpm and 54 gpm ultrafiltration system in 1976 dollars which Dr. Menz

---

**8.** Ultrafiltration is a membrane process which allows water and small molecules to pass through while excluding large molecules such as oils and detergents. The Development Document for Metal Finishers, EPA (1980), states that "[s]uccessful commercial use [of ultrafiltration] has been proven for the removal emulsified oils from wastewater and recovery of rinse water and detergent solutions in phosphate washers. The ultrafiltration process is well developed and is commercially available for the treatment of wastewater or the recovery of certain liquid and solid constituents." The advantages EPA cites includes: lower capital equipment, installation and operating costs in comparison to chemical treatment; very high oil removal efficiency; little, if any, pretreatment required; compact design uses little floor space and provides spill protection.

adjusted to 1984 dollars. These configurations, however, did not take into consideration changes made to the wastewater system since 1984. These changes, installation of an automatic flow meter and the elimination of metal plating, greatly reduced the number of gallons of water that circulated through the system. In as much as ultrafiltration systems are individually sized, any significant change in the water flow would affect the size and cost of the wastewater system installed. Consequently, Dr. Menz' estimation of an economic benefit of between $1 million and $2.5 million to Universal Tool for not installing appropriate pollution controls was an incorrect valuation, even assuming Dr. Hughes' analyses were accepted, which it is not. Accordingly, the court does not find that defendants rejection of the ultrafiltration system amounted to an economic windfall in defendant's favor nor was there any purposeful behavior to avoid the costs of complying with its NPDES permit.

However, the court does find persuasive plaintiff's argument that while the defendants did install an alternate wastewater system, it was four years after the commencement of the 1984 NPDES permit. This four year delay, in the face of significant number of exceedances, translated into an economic benefit to the defendant. Plaintiff has offered the court no guidance as to the defendant's benefit from this delay. The evidence revealed that the defendant spent $131,357.16 for the installation of a Lamella clarifier and supporting equipment. The defendants had the use of these funds for a four year period which based upon the defendant's average return on equity of 16.1 percent, amounted to an economic benefit of approximately $85,-000.00. The plaintiff presented no evidence on any economic benefit the defendant incurred by deferring the operation of the Lamella clarifier for four years.

### C. *History of Violations*

The court finds that the 1,977 violations that are subject to this suit are for the period May 1984 through November 1988. However, the defendant has been in violation of its permit since effluent charges were first regulated in 1975. Consequently, the court will not mitigate the maximum penalty due to this factor.

### D. *Good Faith Efforts to Comply*

At the trial the defendant's good faith efforts to comply with its NPDES permit limitations were a matter of much debate. Plaintiff argued that the steps Universal Tool took were not the results of "good citizenship," but rather an attempt to minimize its exposure in this litigation.

In support of its position, plaintiff points to the fact that the Lamella clarifier defendant choose to install in lieu of the ultrafiltration system, was installed four years after the onset of its 1984 permit. During the four year intervening period, there were substantial violations which the court should take into consideration in deciding the amount of good faith demonstrated by the Universal Tool. Furthermore, metal plating of the jacks did not cease until 1989, two years after Universal Tool determined that the metal plating process was the source of the toxic metal chromium. Moreover, the defendant has yet to successfully address the problem of its BOD. Additionally, Norman Ritenaur, Universal Tool's former president, informed IDEM that the State's administrative proceedings had little effect upon Universal Tool's efforts to comply with its permit. It was Atlantic States' threat of a lawsuit that spurred Universal Tool to action. Finally, plaintiff argues that defendant's long list of improvements and associated costs are costs defendant was required to expend in order to comply with its permit. The defendant should not be rewarded for doing what it was legally required to do.

The policy considerations of the Clean Water Act are rather clear. Since the parties are dealing with complicated technological problems which are not always that simple to solve, the statute takes into consideration the fact that if a defendant can demonstrate they have been proceeding in a good faith attempt to come into compliance with the permit, then credit is given under the mitigating factor of good faith

efforts. The court finds that there was no evidence that Universal Tool purposefully engaged in any kind of strategy to avoid installing a competent system. The record is clear that defendant did not sit on its hands but worked diligently with IDEM. Moreover, Universal Tool realized the difficulties it had with its discharge of pollutants and engaged several consultants to address the problems. All improvements recommended by its consultants were made by Universal Tool. Finally, it is fair to state that since the installation of the Lamella clarifier, Universal Tool's violations have reduced significantly.

With respect to the alleged comments by Universal Tool's former president, Mr. Ritenaur denied making the remarks. Mr. Ritenaur admitted that he was guilty of flippancy from time to time but he was unaware of any remark that could have been interpreted as was disclosed at trial. Notwithstanding the disputed exchange, it has not been challenged that there was a considerable amount of activity by Universal Tool from the inception of its April 1984 permit until September 15, 1986, when Atlantic States gave notice of its intent to file suit.[9] While the installation of the wastewater treatment system and the cessation

---

9. August 1984—Installed improved design of settling tubes in clarifier. Purpose: An improved design of the settling tubes was installed to increase the efficiency of removing suspended solids and precipitated metals from the wastewater in the clarifier.

February 1985—Installed new mixing motors. Purpose: To make added water treatment chemicals work, mixing of the wastewater and treatment chemicals must be done. Speed of mixing is important. These motors were installed on the existing mixers to improve the treatment process.

April 1985—Installed second 6,000 gallon clarifier. Purpose: Only one clarifier was installed in 1978. By adding the second clarifier, the treatment plant capacity was doubled.

April 1985—Installed improved filters. Purpose: Newly designed state of the art filter plates were installed on the filter press.

May 1985—Installed improved oil skimmer. Purpose: The oil skimmer installed in 1978 was replaced with a state of art unit. Oil skimmers remove floating oil from the wastewater treatment tanks.

June 1985—Redesigned oil removal system. Purpose: To use the new oil skimmer effectively, the entire oil removal system had to be modified.

September 1985—Installed baffles in cleaner tank. Purpose: Baffling of tanks so that the cleaners (which becomes the wastewater to be treated) could be cascaded from one section of the tanks to the other section to reduce the volume of wastewater to be treated.

September 1985—Installed improved filter press plates. Purpose: New state of art filter plates were installed in the filter press.

October 1985—Purchased hot water pressure washer to clean filters of the filter press. Purpose: This device improved the ability of the filter press to make a more consistent, dryer filter cake.

November 1985—Installed new liner and dike around plating bath storage area. Purpose: To provide a containment area for spilled plating solution.

December 1985—Installed a chemical metering pump. Purpose: Automate the addition of water treatment chemicals and neutralizing agents for accurate control.

1986—Added wastewater treatment plan operators to payroll so that at least one operator was on each shift. Purpose: Original design was for the treatment plant to operate automatically. Operators added to monitor the treatment plant around the clock.

1986—Traced piping of flow drains from opening point of discharge and closed those drains where discharge appeared to be adversely affecting the wastewater treatment process. Purpose: A field investigation was undertaken of the entire plant to determine the location, direction and discharge point of all internal piping of the plant. The purpose was to assure that all piping was going where it was suppose to go.

1986—Installed modified valving on plating machines. Purpose: The purpose was to make sure that segregated discharge lines discharged to the proper treatment tanks in the wastewater treatment plant.

1986—Added flow restrictions to plating machines. Purpose: Flow restrictor prevented an excess of flow to be discharged to the treatment plant.

January 1986—Installed larger sludge hold tank. Purpose: The larger sludge hold tank allowed a continuous operation of the filter press rather than intermittent use.

January 1986—Installed new oil skimming device. Purpose: To achieve better efficiency in removing floating oils.

March 1986—Installed flow restrictions on all plating rinse tanks. Purpose: To prevent flooding of the wastewater treatment plant.

March 1986—Installed a "Polyblend" mixing device for polyelectrolyte addition to treated waters. Purpose: Polyelectrolytes are water treatment chemicals used to achieve high efficiency solids removal from water. Since these chemicals must be used in very small quantities, a special mixing device must be used.

April 1986—Installed new mixtures on treatment tanks in flocculation section. Purpose:

of the metal plating process was initially delayed, the court finds the interim improvements by Universal Tool evinced good faith. Although it is clear that Universal Tool should have been more expeditious in its approach to resolving the problems, the court will consider Universal Tool's good faith efforts as a mitigating factor.

### E. *Economic Impact on Violator*

The defendant offered no argument or evidence at trial that indicated a large civil fine would have an adverse effect on the operations of Universal Tool. The financial statements of both Universal Tool and its parent, Acme Steel were offered by the Atlantic States. An examination of Universal Tool's 1986–89 financial statements and parent, Acme Steel's 1990 10k report, provided the court with some parameters to evaluate the impact of any penalty imposed.[10] Furthermore, notes set forth in Acme's 1990 10k report demonstrated that management was aware of potential fines being imposed for its failure to comply with various federal, state and local environmental statutes and regulations.

### CONCLUSIONS OF LAW

This court has jurisdiction of the parties and the subject matter of this action pursuant to 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331.

■ The imposition of a civil penalty is to curtail the pollution of this nation's waterways by discouraging future violations. *SPRIG of New Jersey v. Hercules*, 29 ERC 1417, 1423, 1989 WL 159629 (D.N.J.1989); *SPRIG v. A.T. & T Bell Laboratories, Inc.*, 617 F.Supp. 1190, 1201 (D.N.J.1985). To further the objective of the Act, the amount of the civil penalty must be high enough such that the penalty does not merely become a cost of doing business. If

not, it becomes more profitable to pay the penalty rather than incur the costs of compliance. *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F.Supp. 1158, 1166 (D.N.J. 1989), *aff'd in part and rev'd in part*, 913 F.2d 64 (3rd Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Further, a substantial penalty reduces the likelihood that polluters will choose accepting the risk that non-compliance will go unpunished. *Id.*

■ Based upon 33 U.S.C. § 1319(d) and the mitigating factors discussed above, the court finds that Universal Tool is entitled to a substantial reduction from the maximum statutory penalty. First, notwithstanding the sheer number of violations, the court found the violations caused minimal environmental damage and therefore were not "serious" within the meaning of the Act. Second, Universal Tool did not enjoy a $1–$2.5 million windfall for not installing appropriate pollution controls as argued by the plaintiff. Instead, the court finds that the economic benefit enjoyed by the defendant was minimally the $85,000.00 in interest it could have earned from the commencement of its 1984 permit until 1988 when Universal Tool finally purchased and installed a Lamella clarifier. Third, the court finds that even though the defendant should have acted more expeditiously, Universal Tool did not close its eyes to the fact that it had problems but worked with IDEM and made good faith efforts to improve its wastewater system. Finally, 33 U.S.C. § 1319(d) suggests another factor that under certain circumstances may be used to lower the penalty incurred by a violator of the permit limitations established pursuant to the Act. If the maximum statutory penalty derived would work an undue hardship on the business involved or would interfere with its continuing busi-

---

The use of the "Polyblend" device required the installation of additional mixers.

May 1986—Installed new ISOC Model 2400 flow meter. Purpose: to automate the monitoring of flow.

July 1986—Repaired lateral drain at the Teutsch Ditch. Purpose: The lateral drain is Universal's outfall pipe to Teutsch Ditch. The county was unable to make a timely repair.

July 1986—Electrical rewiring of treatment building. Purpose: Increase electric service capacity to accommodate treatment system.

**10.** Universal Tool's average income for 1986–89 was $1,351,506.00. At the end of fiscal year 1989, Universal Tool had $6,679,749.00 in retained earnings. Acme Steel, its parent, had an average income of 13,603,000.00 for years 1987–90. (Acme acquired Universal Steel in 1987).

ness, the Court has discretion to reduce the penalty accordingly. *SPRIG v. Hercules,* 29 ERC at 1420. The financial statements of Universal Tool, an employer of 400, in DeKalb County, revealed that the average net income for years 1986 through 1989 was $1,351,506.00, although the court was offered no guidance from the parties as to how to evaluate this point. Having carefully considered all of the above findings and analyses, the court imposes a civil penalty of $450,000.00.[11]

### OTHER EQUITABLE RELIEF

■ Both parties proposed that the penalty imposed be paid to private environmental organizations or a state environmental organization. However, recent case law makes it clear that once there has been a judicial finding of liability, a court has no choice but to impose a civil penalty and civil penalties must be paid to the United States Treasury. *Friends of the Earth v. Archer Daniels Midland Co.,* 780 F.Supp. 95 (N.D.N.Y.1992); *Sierra Club v. Electronic Control Design Inc.,* 909 F.2d 1350 (9th Cir.1990); *Tyson Foods,* 897 F.2d 1128; *Gwaltney,* 890 F.2d 690; *Roll Coater,* 21 Envtl.L.Rep. 21073. The judicial finding of liability in the present case was determined on summary judgment. Accordingly, defendants are to provide payment of the civil penalty to the United States Treasury in the amount of $450,000.00.

■ In addition, plaintiff sought to enjoin defendants from future violations of the terms and conditions of NPDES permit No. IN000639. The court need not address this issue because the permit expired on its own terms. The defendants are currently regulated by a new NPDES permit.

■ Finally, plaintiff sought an order directing defendant to remediate the conditions of Teutsch Ditch. However, the responsibility of the cleaning Teutsch Ditch is within the jurisdiction of the DeKalb County Drainage Board, the cost of which will be defrayed by an assessment against those property owners within the drainage area of Teutsch Ditch. David Wolf, County Surveyor for DeKalb County, stated that Teutsch Ditch is scheduled to be cleaned and that $48,000 has already been allotted to complete the project. If the County finds that additional work is required to clean and restore the ditch to into compliance, a special assessment may be made against the parties responsible for any extra cost, such as Universal Tool. Accordingly, the equitable remedy requested by the plaintiff herein would be redundant of the statutory mechanism already in place.

### CONCLUSION

It is hereby ORDERED, ADJUDGED, and DECREED that pursuant to Clean Water Act, 33 U.S.C. § 1365, the defendant shall pay a civil penalty of $450,000.00 and made payable to the United States Treasury. The clerk is hereby directed to enter judgement.

Plaintiff is ordered to file a motion for attorney fees and costs within twenty days from the date of this order, detailing their request for attorney fees and costs.

---

**11.** The court notes that plaintiff's counsel in closing arguments argued that the civil penalty to be imposed should be $2.5 million. This position was based upon the premise of the validity of the plaintiff's claim of an economic benefit to the defendant of $1–2.5 million, which the court rejected, as well as plaintiff's claim of bad faith and ecological seriousness of the violations, which the court has also rejected. Defendant's counsel suggested a penalty of $25,-000.00 in his argument.